IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 16, 2019

**STATE OF TENNESSEE v. KETORRENCE EUGENE ROLLINS**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-D-2167   Angelita Blackshear Dalton, Judge**

_____

**No. M2018-02150-CCA-R3-CD**
_____

The defendant, Ketorrence Eugene Rollins, appeals his Davidson County Criminal Court jury convictions of two counts of aggravated robbery, arguing that the evidence adduced at trial was insufficient to sustain his convictions. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jay Umerley (on appeal) and Michael Shaw Cunningham (at trial), Nashville, Tennessee for appellant, Ketorrence Eugene Rollins.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy M. Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Davidson County Grand Jury charged the defendant with one count of the aggravated robbery of Jaret Johnson and one count of the aggravated robbery of Joseph Fletcher.

At the July 2018 jury trial, Jaret Johnson testified that around 1:00 a.m. on July 22, 2016, while he was working as a sales associate at the Exxon Tiger Mart in Green Hills, two black men entered the Tiger Mart with their faces completely covered except for their eyes. One of the men had a gun and approached Mr. Johnson at the register and said "give it up or you know what it is." Mr. Johnson gave the man approximately $100 from the register and his cellular telephone, and the perpetrators then left the store. Mr. Johnson said that the men also "could have took some cigars or

something" from behind the register because he saw them "messing with those." Mr. Johnson said that he feared for his life during the robbery, stating "I didn't want to get shot over something stupid." A customer was "in the back" of the store near the drink cooler at the time of the robbery, but Mr. Johnson "wasn't paying him any attention. I was just focused on the guy who was with me."

The store was equipped with video surveillance cameras which captured the events, and the jury viewed the video recordings. On the video, the man who demanded that Mr. Johnson give him the money from the register could be seen wearing "[s]ome white and black shoes." That man was also wearing a "black or blue" bandana with "the regular bandana print." Also on the video, the perpetrators could be seen leaving the store and getting into a white vehicle. Mr. Johnson said that he "knew it was a four-door white car" but did not otherwise have any identifying information about the vehicle.

During cross-examination, Mr. Johnson acknowledged that he could not identify the two men who robbed him. He described the cigar boxes that the men handled as "Cigarillos. . . . [that] come like two in a pack." Mr. Johnson stated that both men touched the door when they exited the store, and one man handled Mr. Johnson's cellular telephone. Mr. Johnson acknowledged that he did not see the perpetrators get into the vehicle, but he "saw them go out the door and . . . saw the car drive off from the store."

On redirect examination, Mr. Johnson identified a dark colored bandana in a photograph as the one that the man with the gun wore "around his face." He also identified photographs of Tiger Mart bags and the type of cigars that were kept behind the register at his store. Mr. Johnson stated that a person who could be seen on the video approaching the store but leaving before entering returned later to talk with police. Mr. Johnson stated that that person walked to the store from "some apartments across the street" and did not arrive or leave in the white vehicle.

During re-cross examination, Mr. Johnson acknowledged that the pattern on the bandana was not unique. He also acknowledged that the cigars seen in the photograph could be purchased at any Tiger Mart.

Joseph Fletcher testified that in the early morning hours of July 22, 2016, he walked to the Tiger Mart from "down the road" to "get a drink." While Mr. Fletcher was "in the process of getting something to drink," "a man came around in the building and another guy came in and at that point I was told that it was a robbery, guns were involved and to get on the ground and that was that." One of the men approached Mr. Fletcher, told him "it was a robbery" and to get on the ground. When Mr. Fletcher saw

that the man had a gun, he "just turned and went straight down to the ground." The man demanded Mr. Fletcher's wallet and cellular telephone, which Mr. Fletcher handed over. Mr. Fletcher described the man as wearing a hood or a mask through which only his eyes were visible; Mr. Fletcher also saw the man's hand when he reached for Mr. Fletcher's wallet.

During cross-examination, Mr. Fletcher stated that both perpetrators were black men, but he could not otherwise identify them. Approximately 30 minutes after the robbery, a police officer used ping location data to determine that Mr. Fletcher's cellular telephone was approximately one mile away. Officers returned Mr. Fletcher's phone to him, but he did not recover his wallet.

Metro Nashville Police Department ("Metro") Officer Marc Haugen testified that he responded to the Exxon Tiger Mart to investigate an aggravated robbery. He spoke with Mr. Johnson and Mr. Fletcher and developed a description of the perpetrators. He also spoke with two other witnesses who approached the store while the robbery was ongoing. After speaking with witnesses and reviewing the surveillance camera footage, Officer Haugen determined that the suspects left the scene in a "four-door white sedan, Chevrolet, with a temp tag." Officer Haugen obtained a potential serial number for certain bills that were taken in the robbery, and he recorded that number in his incident report.

On cross-examination, Officer Haugen testified that, in his notice to dispatch, he described the suspects as two black males wearing dark hoodies and driving a white four-door sedan with a temporary tag. Officer Haugen stated that another officer lifted fingerprints from the door, a box of cigarillos, and Mr. Fletcher's iPhone.

Metro Officer Spencer Harris testified that in the early morning hours of July 22, 2016, he "saw a white Chevy Cruz with its lights turned off doing an[] excessive amount of speed cross right in front of me" and run a stop sign at a four-way stop on Tucker Road in north Nashville. When Officer Harris turned to initiate a traffic stop, he saw that the vehicle "had wrecked out, jumped over a road and hit a tree head-on." Officer Harris described what happened next:

> I saw smoke coming from the hood and I jumped out and there was an individual out front walking around the vehicle trying to get [a woman] . . . out and at that time I noticed what kind of vehicle, it had temporary tags and . . . I remember there being a be on the look-out for that vehicle being stolen and at that point . . . I was calling for back-up and I noticed

there were four occupants. Three were in the vehicle and the
driver was out of the vehicle and the car started to ignite like
it was going to catch on fire.

Officer Harris held the driver of the vehicle at gunpoint and instructed him to get on the ground. Officer Harris then "got the lady out of the car and . . . back-up arrived" just as "the fire started kindling and getting bigger." Another passenger told Officer Harris that "he was crippled," but when Officer Harris "told him the car is on fire amazing[ly] he got up and got out. He was able to walk out of the car." After getting all of the occupants out of the vehicle, Officer Harris detained them. The four occupants of the vehicle were later identified as Dontae Ryans, Vonzellae Harris, Don'Quise Kelton, and the defendant.

Inside the vehicle, Officer Harris saw "a couple of bandanas," a Glock pistol, and money. Ms. Harris also had a pistol in her purse. Officer Harris stated that he detected the odor of marijuana emanating from the vehicle.

On cross-examination, Officer Harris recalled that the description of the robbery suspects that he heard on the radio was three black male occupants in a "white Chevy Cruz with a temp tag." Officer Harris identified the defendant as one of the passengers that he helped out of the back seat of the vehicle. Officer Harris clarified that when he saw the Glock pistol, it was lying on the ground "like right around the front door" of the vehicle.

Metro Officer Geoffrey Daugherty testified that, when he arrived at the scene of the crash, he saw smoke and flames coming from the vehicle with three occupants still inside and one "standing outside of the passenger side trying to help someone get out." Officer Daugherty assisted Officer Harris in getting the passengers out of the vehicle and then he sprayed the fire with a fire extinguisher. While spraying the vehicle, Officer Daugherty noticed money on the ground and inside of the vehicle, some cigar wrappers, and a gun lying on the ground "right outside the driver's side of the car." Officer Daugherty estimated that the site of the crash was approximately 15-20 miles from the Exxon Tiger Mart where the robbery occurred.

During cross-examination, Officer Daugherty clarified that the description of the robbery suspects that he heard over the radio was of "three male blacks," at least two of whom had guns, and a "white four-door sedan." When Officer Daugherty first arrived at the crash site, he saw only smoke coming from the vehicle, but flames began within 20 seconds of his arrival.

Metro Crime Scene Investigative Officer Warren Fleak testified that he

collected fingerprints from the Tiger Mart door, a cigar box, and "an iPhone that was found away from the scene."

During cross-examination, Officer Fleak stated that when lifting a fingerprint, he could not determine how old the fingerprint was because a "fingerprint will remain until it is destroyed or contaminated," but he agreed that a fingerprint is more likely to be destroyed in high-traffic areas.

Metro Detective Anthony Chandler testified that he collected a buccal swab from the defendant pursuant to a search warrant for the defendant's DNA.

Metro Detective Zachariah Bevis testified that, during his investigation of the robbery, he executed a search warrant for the defendant's personal property, including his shoes and socks, that was being held by the Davidson County Sheriff's Office. He said that the shoes "appear[ed] to match the shoes observed by one of the suspects in the surveillance video collected from the robbery." During his investigation, Detective Bevis requested DNA testing on "a black bandana, a grey winter hat, and some black sn[ea]kers, t-shirt and it looks like pants and a belt" that were all recovered from the scene of the crash.

Metro Officer Justin Cregan testified that, when processing the crash scene, he photographed and collected "[c]igarillos and cash and a shopping bag" from inside of the vehicle. He also photographed and collected a "dark colored bandana," "a toboggan like winter hat," "a Glock .9mm pistol with an extended magazine," "[c]amouflauge pants," and a black shirt that were all scattered on the ground outside of the vehicle.

During cross-examination, Officer Cregan acknowledged that at least one of the photographs that he took of the inside of the vehicle showed a dark colored bandana with the same markings as the one that he photographed outside of the vehicle. He stated that he did not collect the bandana from inside of the vehicle. Officer Cregan testified that he collected all of the cash that he found at the scene, but he did not find a bill with the serial number matching the potential serial number of a bill stolen from the Tiger Mart.

Metro Detective Erin Riley testified that the vehicle crash was reported exactly one hour after the initial 9-1-1 call was made regarding the robbery. She estimated that the crash site was "about 18 to 20 minutes" away from the Tiger Mart. Although she did not respond to the crash site, Detective Riley learned that Mr. Kelton, Mr. Ryans, and the defendant were transported to the hospital, but Ms. Harris was not. Detective Riley said that it was common for perpetrators to dispose of wallets that are

taken during a robbery "because that is an easy way to identify where that came from if the suspects made contact with police later on." Mr. Fletcher's cellular telephone was found along the roadside on the route from the Tiger Mart to the crash site. Mr. Johnson's cellular telephone was recovered the next day from the white sedan. In speaking with witnesses at the Tiger Mart, Detective Riley learned that the suspects fled in a "white Chevy Cruz" with "either a temp tag or some type of paper where the license plate would normally affix to." She also learned that at least one suspect was "carrying a handgun with an extended magazine" and had taken White Owl cigarillos.

The white sedan was searched the next day at the tow lot with the consent of the owner, and officers found White Owl cigarillos, three cellular telephones, and "a paisley print bandana." Detective Riley stated that the bandana and shoes that one of the perpetrators could be seen wearing in the surveillance video were also recovered.

On cross-examination, Detective Riley testified that "two paisley bandanas" were found during the investigation – one on the ground outside of the crashed vehicle and one inside of the vehicle – but that only the bandana found on the ground was collected. Detective Riley said that the defendant did not have a hooded sweatshirt in his property at the jail. She also said that two guns were used in the commission of the robbery, the Glock and a Keltec that was found in Ms. Harris' purse, but that neither of those guns were dusted for fingerprints. Detective Riley acknowledged that, of the fingerprints collected at the robbery scene, none were a positive match to the defendant. She stated that the description of the suspects that was dispatched over the police radio was for three black males, including the two perpetrators and the driver of the white Chevy Cruz. Detective Riley said that one of the men got into the front passenger seat of the vehicle when leaving the Tiger Mart, but that Ms. Harris was in the front passenger seat when the vehicle crashed.

Metro Officer Jessica Davis, certified as a fingerprint identification expert, testified that she compared several fingerprints lifted from the crime scene to those of the defendant, Mr. Ryans, and Mr. Kelton. In these comparisons, Officer Davis determined that all three subjects were excluded as possible contributors of several fingerprints lifted from the door to the Tiger Mart, a White Owl cigar box, and an iPhone. Officer Davis determined that other prints were "of no value," meaning "that there was not enough or sufficient ridge detail to make a comparison." Officer Davis explained that it was possible for someone to leave no fingerprint when touching an item or for multiple fingerprints to be left on an item in such a way that they covered up other fingerprints. Officer Davis said that she could not determine the timeframe of when a fingerprint had been left.

During cross-examination, Officer Davis stated that the first lift card that she compared to the subjects and listed as 001-01 on her report, contained three separate impressions and that the defendant was excluded as the contributor of five total individual prints. Officer Davis explained that fingerprints degrade over time and, as such, it was more reliable to collect prints shortly after they had been made. Officer Davis stated that latent fingerprints could be entered into the Automated Fingerprint Identification System, a database of all fingerprints collected from individuals booked into a Metro jail, to search for a match, but she did not do that in this case.

Metro Crime Laboratory employee Rachel Mack, testifying as an expert in DNA analysis, stated that she received buccal swabs from the defendant, Mr. Ryans, and Mr. Kelton to establish their DNA profiles. She compared those DNA profiles to DNA found on certain items collected during the investigation, including a black bandana, a gray winter hat, a black t-shirt, and camouflage cargo pants. In her testing of the black bandana and gray winter hat, Ms. Mack determined that the defendant was a match to the major DNA profile found on those items. Ms. Mack explained that "[w]e reserve the word match for full DNA profiles. That means that I have data at every location that I am looking at and those two DNA profiles match at every location that we are looking at." The bandana and hat also had a minor DNA profile, but Ms. Mack was unable to determine its source because "there was such a limited amount." The DNA found on the black shirt was consistent with that of Mr. Kelton.

During cross-examination, Ms. Mack explained that the items she tested indicated the presence of a major and a minor DNA profile, indicating the presence of DNA of two different individuals. She was unable to determine the source of the minor DNA profile on any item. Ms. Mack stated that she could not determine when DNA had been deposited onto an item.

The State rested, and the defendant did not testify and presented no proof.

The jury convicted the defendant of the aggravated robberies of Mr. Johnson and Mr. Fletcher. After a sentencing hearing, the trial court imposed an effective sentence of 11 years' incarceration. Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the evidence is insufficient to support his convictions.

*Sufficiency of the Evidence*

The defendant contends that the State failed to present sufficient evidence to establish his identity as a perpetrator of these crimes. We disagree.

-7-

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). Whether the State has established the defendant as the perpetrator of the charged offenses beyond a reasonable doubt is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361 app. at 388 (Tenn. 2005)); *accord State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982) (citing *Stubbs v. State*, 393 S.W.2d 150, 153 (Tenn. 1965)).

Here, the State's evidence established that, in the early morning hours of July 22, 2016, two masked men entered the Exxon Tiger Mart in Green Hills and robbed Mr. Johnson and Mr. Fletcher at gunpoint. At least one of the perpetrators used a black paisley bandana to cover his face and wore white and black sneakers. The perpetrators took the victims' cellular telephones, Mr. Fletcher's wallet, and cash and cigarillos from the store and then fled in a white, four-door Chevrolet Cruz with a temporary tag. One hour later, Officer Harris spotted a vehicle matching that description speed through a stop sign and crash into a tree. The defendant was found in the vehicle along with Mr. Kelton, Mr. Ryans, and Ms. Harris. At the crash scene, officers found a black paisley bandana matching the one used by one of the perpetrators and containing the defendant's DNA. Officers also found a Glock with an extended magazine, Mr. Johnson's cellular telephone, over $200 in cash, and numerous packages of cigarillos. Mr. Fletcher's

cellular telephone was found on the side of the road along the route from the Tiger Mart to the crash site. The defendant's shoes matched the shoes worn by one of the perpetrators as seen on the surveillance video.

From these facts, a rational trier of fact could have found beyond a reasonable doubt that the defendant was one of the men who robbed Mr. Johnson and Mr. Fletcher at gunpoint at the Exxon Tiger Mart. Accordingly, sufficient evidence exists to support the defendant's convictions for aggravated robbery.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE